## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **STEVEN ERIC KIRCHNER,**<br>**ELIZABETH LEE KIRCHNER, and**<br>**NAZRET Z. GEBREMESKEL,** )<br>)<br>)<br>) | |
| **individually and on behalf of**<br>**all other persons similarly situated,** )<br>)<br>) | |
| **Plaintiffs,** )<br>) | |
| ) | **Case No. 20 –** |
| **vs.** )<br>) | **JURY TRIAL DEMANDED** |
| **WYNDHAM VACATION RESORTS,**<br>**INC.,** )<br>)<br>)<br>) | |
| **Defendant.** ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, Steven Eric Kirchner, Elizabeth Lee Kirchner (Kirchners), and Nazret Z. Gebremeskel (Gebremeskel), individually and on behalf of all other persons similarly situated, allege on personal knowledge, investigation of their counsel, and on information and belief, as follows for their Complaint against Defendant Wyndham Vacation Resorts, Inc. (Wyndham).

## NATURE OF ACTION

1.   This is a class action against a Delaware corporation alleging uniform and common material omissions in the sales presentations that it makes to timeshare Owners in the States of Nevada and Tennessee.   The claims are brought under the Nevada Deceptive Trade Practices Act and the Tennessee Timeshare Act.   The named Plaintiffs attended Wyndham sales presentations in these two States and signed their contracts in the two States.

2.   In its Nevada and Tennessee presentations, Wyndham intentionally and consistently

makes one fundamental omission.    It fails to disclose to prospective Wyndham timeshare owners that instead of purchasing Wyndham timeshares for an average price of $21,000 that they can often obtain equal or greater access to Wyndham resort destinations at an equal or lesser cost without buying timeshares.     Consumers can achieve this result by booking through public websites such as tripadvisor.com.[1]    Prospective owners are not told of the significant availability issues of trying to book through the Wyndham Owner website, myclubwyndham.com.   Nor are they told that due to ever increasing annual maintenance fees, it will be often be cheaper to go to the same destinations without being a Wyndham timeshare Owner.

3.    Instead, during high pressure sales presentations that take up to six or seven hours, Wyndham repeatedly conveys the opposite message, ie. that Owners will save money on vacations by buying Wyndham timeshares and that they will have great flexibility with the option of choosing many different available resorts.     It is not adequately disclosed that they will often have to book a year or more in advance and that many destinations will not be available to them on the Owner website, myclubwndham.com, but that the same destinations will be available to them at the same desired time on public websites.

4.    In short, the reality of Wyndham timeshare ownership is the opposite of what is represented in Wyndham sales presentations.   Owners are locked into timeshare ownership that has limited availability of destinations, often requires that bookings be made a year or more in advance, and results in Wyndham Owners paying more for vacations than they would on public travel websites.

---

[1] Average cost of Wyndham time share as reported in November 28, 2018 Wyndham press release.    See https://www.wyndhamdestinations.com/us/en/news-media/press-releases/millennials-are-buying-a-lifetime-of-vacations-for-less-than-the-cost-of-a-peppermint. (Last visited March 23, 2020.)

5.    Moreover, due to increases in maintenance fees, Wyndham owners end up with timeshare ownerships that have negative value.

6.   As a result of these omissions, Wyndham is able to sell timeshare points at prices ranging from $15,000 to $25,000, while the same number of points can be purchased on ebay for amounts as little as $1.

7.   Wyndham's practices are so widespread that a cottage industry of timeshare exit companies has developed promising to get people out of timeshares.   Unfortunately, many of these exit programs are just as deceptive as the original timeshare sales pitches.   Faced with a massive number of claims, Wyndham has inserted mandatory arbitration clauses into more recent contracts to cut off class actions.    This action is brought on behalf of purchasers who signed contracts in Nevada and Tennessee who do not have class action waiver clauses.

8.   Wyndham's timeshare sales policies and practices are consistently deceptive and misleading.   Wyndham omits to disclose material information about fundamental aspects of its timeshare program including the minimal resale value of timeshare points, the persistent availability issues, the true nature of maintenance fees, and the cost of travel through Wyndham timeshare ownership versus websites such as trivago, trip advisor and google.

9.   Wyndham's business model is premised on the false assumption that you can lie to consumers to get them to sign confusing, vague and ambiguous boilerplate contracts and that because then there is a written agreement purportedly disclaiming all falsehoods, you have no liability for the lies. This is not the law.

10.   Wyndham says anything to get people to sign contracts.   It refuses to let them out when they realize they have been deceived.   The practices are particularly damaging to senior

citizens and retirees, many of whom borrow heavily to finance their purchases, sometimes taking out home equity mortgages to come up with the money to pay Wyndham, and who face the prospect of bankruptcy when Wyndham refuses to let them out of boilerplate contracts.

11.    Wyndham has been heavily sanctioned for its deceptive practices through state government penalties, orders requiring rescission of purchase contracts and a $20 million verdict in a whistle blower case.   Instead of reforming its practices, it has doubled down on its deceptions.

12.    Since 2003, there has been a steady drum beat of adverse awards against Wyndham as well as settlements forcing it to pay damages, penalties and grant rescission.

13.    In October 2003, the California Attorney General and the District Attorney for the County of San Mateo sued Trendwest Resorts, the predecessor of Wyndham, for its unlawful sales practices and material misrepresentations.    The case was settled with Trendwest agreeing to an injunction barring it from further violations and requiring it to offer rescission to customers. It also had to pay $795,000 in civil penalties.   The estimated total value of the settlement was $ 4.3 million.   The California Attorney General issued a Press Release about the settlement saying "Trendwest [predecessor to Wyndham] misled consumers through deceptive sales practices and non-disclosure, and illegally denied consumers the ability to cancel their contracts." Trendwest Will Pay Restitution to Consumers and $795,000 in Civil Penalties", October 29, 2003, https://oag.ca.gov/news/press-releases/attorney-general-lockyer-settles-lawsuit-against-one-worl ds-largest-timeshare. (Last visited August 10, 2019.)

14.    In 2007, California customers sued Wyndham in a class action.    The case settled on a class basis.   *(Wixon et. al. v. Wyndham Resort Development Corp.*, N. D. Cal.   Case No. C 07-02361.)    The settlement class consisted of California residents, and persons who entered into

4

transactions in California, who bought Worldmark timeshare interests from Wyndham.    The settlement was for persons who purchased timeshares before November 5, 2006.    Wyndham agreed to cancel 22 million vacation credits; it made changes to its timeshare program; and it agreed to pay class counsel up to $5 million in legal fees.

15.    In 2015, the State of Wisconsin sued Wyndham for rescission of timeshare purchase contracts with 29 owners.    As part of a settlement, Wyndham agreed to pay $665,000 in restitution, a $99,520 civil fine, $62,702.20 in fees and costs, and to rescind the contracts.    (Sauk County Wisconsin Case No. 2015CX000005).    The Wisconsin Department of Agriculture, Trade and Consumer Protection alleged that Wyndham sales personnel had made misrepresentations inconsistent with purchase contracts, telling customers gift incentives were available for one day only, and not disclosing on first contact with prospects that a timeshare sale was being offered. The restitution and debt relief was as high as $84,698 for one Madison, Wisconsin couple.    After the settlement, Wyndham issued a press release promising to "meet the highest standards of fairness and transparency to consumers".

https://www.wiscnews.com/news/local/crime_and_courts/wyndham-settles-consumer-complaints-for/article_c041b926-efda-53da-8d61-5560c7fc3718.html (Last visited August 13, 2019.)

16.    In 2016, a Wyndham whistle blower employee was awarded $20 million *(Williams v. Wyndam Vacation, Ownership, Inc.*,   San Francisco Superior Court,   Case No. CGC- 12- 526187) after being wrongfully terminated.    The whistle blower exposed that Wyndham defrauded elderly customers, opened and maxed out credit cards without their knowledge, and lied about fees.    In its rulings on post-trial motions, the court found that "Wyndham's San Francisco site was defrauding many customers, mainly the elderly... When timeshare sales were off,

Wyndham had 'TAFT Days' – "Tell Them Any Frigging Thing'". (See *Williams*, *supra*, Slip Op. at pp. 1-2 dated March 10, 2017 attached as **Exhibit A** .)

**PARTIES**

17.   Plaintiffs Steven Eric Kirchner and Elizabeth Lee Kirchner are residents of the State of South Carolina.   They executed their Wyndham timeshare contract entitled, "Security Agreement, ClubWyndham Access Vacation Ownership Plan, Retail Installment Contract, Purchase and Security Agreement (Tennessee)", **Exhibit B**, on or about February 11, 2018 in Tennessee.

18.   Plaintiff Nazret Z. Gebremeskel lives in the District of Columbia.   She signed her "Security Agreement, ClubWyndham Access Vacation Ownership Plan, Retail Installment Contract, Purchase and Security Agreement (Nevada)", **Exhibit C**, on or about September 2, 2017 in Las Vegas, Nevada.   By filing this suit, Plaintiffs are requesting cancellation of their contracts in addition to all such requests previously made.

19.   Defendant Wyndham is a Delaware corporation.   Its principal office is at 6277 Sea Harbor Drive, Orlando, FL 32821.[2]

**JURISDICTION AND VENUE**

20.   This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).   This is a civil action in which the matter in controversy exceeds the value

---

[2]The holding company for Wyndham is a publicly traded company known as Wyndham Destinations Inc.   Wyndham Destinations Inc. is also a Delaware corporation.   On or about March 19, 2018, Wyndham Worldwide announced its filing of a Form 10 Registration Statement whereby it was separated into two public companies.   One public company which owns and operates hotels was the Wyndham Hotel Group which became known as Wyndham Hotels and Resorts, Inc.   The other public company which offers timeshares is Wyndham Destinations Inc.

of $5,000,000, exclusive of interests and costs.    At least one class member is a citizen of a state that is different from the state of citizenship of Wyndham.

21.   Defendant Wyndham is subject to jurisdiction in this District by virtue of its Delaware incorporation.

22.   Plaintiff Gebremeskel was one of the named plaintiffs in a previously filed class action styled, *Deneen et al. v. Wyndham Vacations Resorts, Inc.* (No. 19-cv-5499 N.D. Ill.). Wyndham moved to dismiss for lack of personal jurisdiction in Illinois.   Wyndham stated that the case needed to be filed either in Delaware or Florida which is why this case is being filed in Delaware.   The Illinois court dismissed the case without prejudice on personal jurisdiction grounds without any ruling on the merits of the claims.   The court allowed discovery to proceed on class certification issues.   Substantial discovery was completed on class certification issues. The Illinois case sought to certify a national breach of contract class, and a consumer fraud class of Illinois and District of Columbia residents.   The claims and classes pled here are narrower.

23.   Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) because Defendant is incorporated in Delaware.   Witnesses reside in the District of Columbia, South Carolina, Nevada, Tennessee and Florida.   Wyndham maintained in Illinois that any suit should be filed in Delaware or in Florida.   Plaintiffs' choice of venue should be given deference.

## **FACTUAL ALLEGATIONS**

24.   Wyndham is the largest timeshare ownership program in the world with 925,000 members and over $5 billion in revenue in 2017.   It develops and operates a portfolio of over 220 resorts throughout the world with 25,000 individual units.    Wyndham markets and sells vacation ownership interests in the form of points, provides consumer financing in connection with the sale

of points, provides property management services to the purchasers, and develops and acquires vacation ownership resorts.

25.    On August 2, 2017, Wyndham Worldwide issued a press release that it would separate into two publicly traded companies.   It announced that Wyndham Vacation Ownership would be the world's largest publicly traded timeshare company. Wyndham Vacation Ownership joined with RCI. RCI was the world's first and largest vacation exchange network with over 4,300 affiliated properties in more than 100 countries.   The joinder of Wyndham Vacation Ownership and RCI was to provide purchasers of Wyndham points with the widest possible availability of timeshare units for vacation usage.   In the press release announcing the change, Michael Brown, CEO of Wyndham Vacation Ownership, stated:

> By joining the largest timeshare company in the world with the largest timeshare exchange network and connecting them seamlessly to the Wyndham Rewards platform, we will be positioned to provide the widest variety of vacation opportunities to our owner base and network affiliates..
>
> *Wyndham Worldwide Announces Plan to Become Two Publicly Traded Hospitality Companies*, Wyndham Destinations Press Releases (August 2, 2017),
>
> https://www.wyndhamdestinations.com/news-media/press-releases/wyndham-worldwide-announces-plan-become-two-publicly-traded-hospitality (last visited Aug. 6, 2019) (**Exhibit D hereto.**)

26.    On its website, Wyndham Destinations Inc. boasts that it has over 4,300 vacation destinations, over 20 brands, and that as the world's largest vacation ownership, exchange and rental company, it makes every trip a perfect vacation experience.

https://www.wyndhamdestinations.com/us/en (Last visited Aug. 6, 2019).

## WYNDHAM'S BUSINESS MODEL

27.   In the traditional timeshare business model, a participant purchased a fractional

interest in a specific piece of property.    The member would own the right to a specific week of occupancy in a particular unit in a specific identified property.  The participant could then be entitled to trade that week of ownership for a week in another property.    However, if the member did not trade his or her week, he or she was guaranteed the right to stay in the identified week in the identified property.

28.    In the Wyndham model, participants purchase points which are supposed to be currency to stay at any Wyndham or affiliated resort throughout the world.  Fundamental to the Wyndham sales and marketing pitch is that purchasers will have a dizzying array of choices and will be able to stay at their desired property wherever it might be.  Purchasers buy points so they can travel to their desired location whether it is Scotland, Colorado, Hawaii or some other place. In fact, desired destinations are not available at the desired time and have to be booked sometimes as much as a year in advance, assuming they are even available.  The sales pitch is false and misleading.

29.    The business practice of Wyndham is to focus on selling points, rather than managing the destinations and making them available to members.    Wyndham makes more money by selling new timeshares than by making accommodations available to existing timeshare Owners. Wyndham members find that there is little availability.    When they complain, Wyndham's response is that they need to buy more points.  Wyndham members are subject to a lifelong frenzied marketing pitch to buy more points and upgrade their membership.  When a member arrives for a vacation at a destination, the sales pitch starts before they have even parked their car. A common Wyndham ploy is not to give a parking pass to a member until they agree to attend an "owner update meeting".  The purported owner update meeting is nothing more than another high-

pressure sales presentation to get them to buy more points.

30.    If Wyndham members manage to get parking passes without committing to attending a sales meeting, they are constantly harassed with phone calls to their rooms and marketing materials under their doors to attend more sales meeting.    These meetings last most of a day and do not conform to most consumers' idea of a vacation day.

### THE MISLEADING AND DECEPTIVE WYNDHAM SALES PRESENTATIONS

31.   The Wyndham sales presentations follow the same pattern.    The key elements are:

a.   As was the case in the State of Wisconsin action, prospects are not told up front that they will be attending a lengthy high-pressure Wyndham timeshare sales meeting,   otherwise, few, if any, people would show up;

b.   Prospects staying at a Wyndham owned hotel or resort are enticed to attend the timeshare sales meeting by the offer of a free gift, free trip, discount coupon or prize;

c.   Purchasers are lied to about how long the meeting will last, the sale pitch is that if you just attend this one hour or ninety-minute meeting, you will "earn" the offered gift or prize;

d.   In reality, the sales presentations usually last five or six hours;

e.   Potential customers are physically worn down by the length of the meetings;

f.   The Wyndham strategy is to break down the prospective purchaser's resistance to buying by relentless physical and psychological pressure;

g.   Prospects are told that they need to buy for the sake of their children, to be able to leave the points to their children, to spend time with their families and to fulfill their dreams of being able to vacation anywhere in the world;

h.   People are kept in the meetings for hours at length by free food, the offered gifts and a never-ending barrage of "special" bonus points if they sign a contract right away.

i.   Attendees at sales presentations are not excused when the promised one to two-hour limit is met.   Where attendees were lured to attend the sales presentation by an offer of "free" accommodations, in order for them to leave, Wyndham sales personnel typically

must sign a document that the attendee met the presentation requirements.   Otherwise, the attendee will be billed the full amount of the "free" accommodations;

j.   Whenever someone shows resistance, the sales person leaves to consult with a manager and then comes back to offer special bonus points, some type of additional prize or gift, and the offer of a higher level of membership;

k.   The sales pressure is relentless throughout the day;

l.   Wyndham makes it difficult for people to leave by the threat of losing their prizes, and other tactics such as checking in purses and transporting attendees in vans to off-site locations so they have no simple way to return;

m.   One-on-one sales pitches are made throughout the day and a prospective purchaser is often assigned one person who stays with them the entire time to befriend them; and,

n.   A false sense of urgency is created with repeated use of phrases such as "one time offer" and "today only" to create the impression that prospects can never have the same opportunity again.

32.   If this was all there was to it, it would simply be a high-pressure sales environment akin to being locked in new car dealership for most of the day.   However, individuals are repeatedly lied to about the material elements of the program including misrepresentations that points will not expire, that units will be available, that maintenance fees will not increase, that long advance booking time is not required, and that points are easily transferable or marketable.   They are then presented with a two or inch three stack of contract documents to sign which supposedly reverse all of the affirmative representations, and tell the Owners the opposite of what they have just heard in the six to eight-hour sales presentation.   As a practical matter, having been worn down by the all-day sales presentation, given limited food during the day, and being handed contract documents that approach one hundred or more pages in length, Owners do not have the time to read these documents.

33.   What the written contract documents fail to disavow are the fundamental material

omissions and failure to disclose that (a) Wyndham time share ownership has limited or negative value, (b) that consumers are often better off using public travel sites such as tripadvsior.com or the free Wyndham Rewards site, and (c) that Wyndham points are valued at next to nothing on ebay. For instance, 84,000 annual Wyndham points secured a bid of $1 on ebay.   (**Exhibit E**.) In contrast, due to the material omissions in the Wyndham sales presentation, the Kirchner Plaintiffs were induced to pay $15,500 for their 84,000 points.

34.   First person narratives about the common omissions at Wyndham sales presentations abound on the web as well in the complaints filed with state regulators.   They tell a common story that the omissions encountered by the named Plaintiffs are typical for putative class members. In a written statement by Kathryn Bryan of Oregon, Ohio filed with the Florida Division of Consumer Affairs on September 5, 2018, she describes the omissions:

> We met with Brett Sherman who described the benefits of owning Wyndham points, how Wyndham was continuously purchasing resort properties for its owners, and how reasonably priced Wyndham points were.   We were about to leave when the sales manager came over and stated that if we purchased 154,000 points at that meeting, he would allocate an additional 154,000 bonus points which would put us in a Silver Owner level.

> We were told that by doing this it would allow us to stay at any of the Wyndham properties around the world**.**   Later we found out this was totality [sic] not true, but the lie did come to light until we tried to a book a week stay in Hawaii for our anniversary.   (**Exhibit F.**)

35.   Kathryn goes on to describe "owner update" meetings which were promised to last ninety minutes.   Purchasers were enticed to attend with $50 gift cards.   The meetings actually lasted four and one-half hours.   Her narrative continues with descriptions of subsequent sales meetings.    She confronted a senior sales manager with misrepresentations made by Wyndham representatives in prior meetings.   He responded:

"Maybe so, but these people are no longer here.   And whatever they told you we do not have to honor'.   He in essence told us that we had been lied to but then said that he could help us get out of this situation if we purchased an additional 210,000 points. ...

We were accompanied to the finance office by all three salespersons.   It felt like we were under arrest or going to the firing squad.   All we wanted to do was straighten out the lies that we had been told that the other salespeople had told us and get the mess cleaned up. We deposited an additional $3842.69 and financed the additional points for $34,807.01      ...

The additional points and our Platinum status would guarantee us reservations at the Emerald Grade any time of the year even in the winter months.   The sales manager did not tell us that Wyndham had only taken over a certain number of 2/3/4 bedroom units (no 1 bedroom units).

We had to discover this on our own when we attempted to book a one week stayed [sic] there and called the Emerald Grande directly.   **We were informed they could not accommodate us in any unit for an indefinite period of time no matter what our level with Wyndham.**

**(Yet more omission/ misrepresentation of facts) But you know it can't even be called that.   It is just out-and-out lying.   (Exhibit F-** emphasis supplied.)

Kathryn's statement highlights the misleading and deceptive Wyndham tactics.   Its sales people routinely falsely tell purchasers that the solution to their availability problem is to spend more money for more points.

36.   Wyndham sales people are trained to make misrepresentations and omissions.      The whistle blower complaint filed by former Wyndham sales people Patricia Williams and Steve Gutfield against Wyndham (Superior Ct. State of California, San Francisco County Case No. CGC 12-526187)( **Exhibit G** hereto) lays this out in excruciating detail. Plaintiffs state in their First Amended Complaint :

... Ms. William overheard other sales associates making illegal and false representations to various customers. ... For example, some owners were informed if they increased their points (points are used to establish eligibility for various products), they could do so at essentially no cost. ...

Other member services representatives falsely represented that they were going to be reducing the monthly statements for owners or that maintenance fees would be 'capped', when in fact such payments were actually being deferred or they were subject to increases.  These 'lower monthly payments' schemes in reality were simply a way to fraudulently induce customers into buying more services and borrowing more money.

Williams First Amd. Complaint ¶17.

37.   The Williams Plaintiffs go on to allege that Wyndham knew of, sanctioned and encouraged the fraudulent behavior in order to drive up sales.  Numerous supervisors and managers were aware of the conduct.  Indeed, sales manager Steven Savino began "conducting training meetings in which he taught employees how [to] use unethical methods for selling timeshares..."  William First Amd. Complaint ¶22, 24.

### PLAINTIFFS STEVEN AND ELIZABETH KIRCHNER

38.   The Kirchners live in Sumter, South Carolina.  Steve Kirchner works for Microsoft and is a designated support engineer for the United States Air Force Central Command Network Operations Security Center.

39.   The Kirchners were offered a two-day promotional trip by Wyndham to stay at a Wyndham location in Pigeon Forge, Tennessee.   The offer required that they attend what was billed as one to two-hour sales presentation.   In fact, the presentation took closer to five hours.

40.   The Kirchners were subject to the same type of Wyndham high pressure sales presentation described above.  They initially declined to purchase Wyndham points, but Wyndham told them there was a special deal available for that day only, that they would get extra bonus points if they signed up, and the cost of the contract was lowered by half from its original price.

14

41.    The Kirchners were told that they would be saving money on vacations by becoming Wyndham owners and that they would have great flexibility in when and where they could travel to Wyndham resorts.

42.   Nothing was said about public travel websites offering equal availability or better availability at an equal or better price.   Nor was anything said about the value of the Wyndham ownership being de minimis and actually going negative over time.

43.   The Kirchners purchased 84,000 points for $15,500.

44.   The Kirchners have been unable to book their desired Wyndham destinations at their desired times.   They have requested cancellation of their contract, but Wyndham refuses to cancel it.

45.   More disturbingly, the Kirchners have discovered that their Wyndham timeshare ownership is actually going to have negative economic value.   They calculated that the annual dollar value of their 84,000 points is about $870.   This calculation is based on how much it would cost them to pay in dollars for the Wyndham rooms they can book with 84,000 points – assuming availability exists allowing them to use the points.   However, their annual maintenance fee is $707 and keeps increasing every year.   Thus, after paying the maintenance fee, the current annual economic benefit of the Wyndham ownership for which they paid $15,500 is about $163 ($870 minus $707).

46.   At the current rate of maintenance fee increases, maintenance fees will exceed $870 within four years.   In other words, the Kirchners will better off owning no Wyndham timeshare contract than owning one.   It will be cheaper for them to book vacations at Wyndham resorts without ownership than with ownership.   This fundamental fact was never disclosed to them.   It

explains why the current bid for 84,000 Wyndham timeshare points is $1 on ebay.  This same type of problem exists for other members of the proposed class.

47.   The further problem that was never disclosed to the Kirchners is that they find that Wyndham destinations are often available to members of the general public and not available to Wyndham timeshare owners.   For instance, they recently searched for Wyndham resort destinations in the Orlando area for the week of April 20, 2020.   They found that accommodations were available at the Club Wyndham Orlando International and Club Wyndham Bonnet Creek Resort through the free Wyndham Rewards website, but not available through the Wyndham timeshare Owner site.   It would have been better not to have paid $15,500 for a Wyndham timeshare, and instead simply be a Wyndham Rewards member for free.

### PLAINTIFF GEBREMESKEL

48.   Plaintiff Nazret Gebremeskel (Naz) lives in the District of Columbia.   She works for the District of Columbia as an unemployment claims examiner.

49.   In September 2017, she was vacationing in Las Vegas, Nevada and wanted to buy tickets for Cirque du Soleil.  The ticket seller told her that she would be eligible for discount tickets if she agreed to attend a ninety-minute presentation where breakfast would be served.   The event was a marketing presentation by Wyndham to sell contracts in its timeshare program. Instead of lasting ninety minutes, the presentation lasted almost seven hours.    It began at 9:00 a.m. and was not over until 4:00 p.m.    When Naz was at the meeting, a Wyndham representative insisted on checking her purse.    She was assigned a single sales agent who spent the whole day with her.    Naz was transported by van from her hotel to the sales meeting at a Wyndham location. That made it difficult for her to leave the sales presentation.   In its form letter denying purchasers

requests to rescind contracts, Wyndham states that no one is forced to stay at these sales presentations and that attendees are "free" to leave.   The truth is that short of locking the doors, Wyndham does everything it can to discourage attendees from leaving.

50.   Naz's experience reflects how Wyndham sales presentations are notorious for their length and sales pressure.   Individuals are enticed to attend by the offer of free gifts or vacation stays which are often hard to redeem.   The sales pitch is promised to be short in length and then drags on for many hours.    The sales personnel misrepresent the availability of vacation properties, misrepresent the cost and fees of the program, and create a false sense of urgency by stating that an offer is good for that day only.   Misrepresentations are also made about resale value of the program, and the reservation process.   These are the sales practices of Wyndham that led the States of California and Wisconsin to sue Wyndham for false and deceptive marketing.

51.   The Wyndham sales presentation to Naz was true to form as a high-pressure marketing pitch.   Various gifts and prizes were offered to induce Naz to sign a contract.    She was offered bonus points, a tablet, and a trip to Las Vegas as incentives to sign a timeshare contract.

52.   The following material facts were never disclosed to Naz:

| Omissions |
|---|
| No disclosure was made that many times, it would be cheaper to book a flight or hotel through trivago.com or other public travel websites than through the Club Wyndham program. |
| No disclosure was made that fees would be required to transfer points for use with RCI, an affiliated timeshare company. |
| No disclosure was made that a Purchaser would have to wait to use points after signing contract. |
| No disclosure was made that approximately $50 fee would be charged to transfer points to RCI. |

53.   Naz signed the "Security Agreement, ClubWyndham Access Vacation Ownership Plan, Retail Installment Contract, Purchase and Security Agreement" dated September 2, 2017 attached as **Exhibit C**.    The total price to be paid for the 126,000 Points after finance charges is $39,489.70.   After signing the agreement, Naz discovered that it was cheaper to book flights to destinations such as Jamaica outside the Wyndham program using public websites that do not charge for points or membership.

54.   She has tried to cancel her agreement, but Wyndham refuses to cancel it.   She also paid $4,595 to American Resource Management Group, LLC who told her they would be able to obtain cancellation of the Wyndham contract.   American Resource failed to do so and is now in bankruptcy.   (S.D. Fl. Bankr. Ct. Docket No. 19-14605.)

## THE OMISSIONS INVOLVING PLAINTIFFS ARE TYPICAL AND INVOLVE COMMON ISSUES OF LAW AND FACT WITH OTHER CLASS MEMBERS

55.   The omissions and misrepresentations made to Plaintiffs at the Wyndham sales meetings are typical of misrepresentations made to other Class Members.   The same fraudulent representations and omissions are made time and again with uncanny regularity to Class Members. A recent public records request to the State of Florida, Division of Consumer Services, revealed consumer after consumer complaining of misleading sales practices relating to the use of Points, availability of destinations, advance booking time required, misrepresentations about the value of Points, and the misrepresentations about maintenance fees. Further, many of the complaining consumers are elderly and retired.    (Copies of some of the complaints produced by the State of Florida are attached as **Exhibit H.**)

56.   What follows is merely a sample of the many formal complaints against Wyndham. These complaints reflect the common nature of the Wyndham omissions and misrepresentations.

| Consumer | Consumers' Own Words | Subject of Misrepresentations |
|---|---|---|
| Ronald Flater<br>Grundy Center, Iowa | "greatly misrepresented" | Value of points<br>Advance booking time required |
| John and Jayne Branscombe<br>Bangor, Maine<br>(80 year olds) | "lies" | Maintenance fees |
| Alberto and Nancy Bernal<br>Auburn, California | "severely lied to" | Omissions in contract |
| Tim and Joy LaFleur<br>Hallsville, Texas | "deceitful tactics" "falsehoods"<br>"fabrications"<br>"misrepresentations" | Maintenance fees<br>Availability<br>Value of points |
| Patricia Wheelock<br>Webster, Florida<br>(Elderly) | "very misrepresented" "lying"<br>"false claims""threaten me" | Availability |
| Carl and Connie Kluttz<br>Gastonia, North Carolina | "all a huge lie" "misrepresented everything" | Value of points |
| David Kuebler<br>Albuquerque, New Mexico | "lies and out-and-out deceit" | Value of points |
| Herbert Chapman Jr.<br>Susan Pollard<br>Surprise, Arizona | "deceived" | Maintenance fees |
| Linda and Frank Valencia | "we have been misled" | Maintenance fee |

| Germantown, Maryland | | |
|---|---|---|
| Billie and Nina Davis Raeford, North Carolina | "false and misleading" | Availability |
| Lonnie Harrington Olive Branch, Mississippi | "Your company's mot[t]o must be: Tell them ANYTHING you have to get their names on the dotted line." | Availability Maintenance fee |
| William and Virginia Radford Bumpus Mills, Tennessee | "we have not been told truthful things" | Availability Advance booking time required Maintenance fees |
| Sandra Derr Lewes, Delaware | "Scam" Salesmen "lie outright to customers" | Value of points |
| Heather Bertolami Brookline, New Hampshire | "we were lied to" | Availability |

57.   Similarly, Wyndham timeshare owners have posted on line the comments quoted below which reflect the commonality of their experience with omissions at sales presentations. (A printed copy of these customer comments downloaded from the cited websites is attached as **Exhibit I -** emphasis supplied throughout**.**)

a.   Cinthia from Wilder 7/9/2019 11:07:24 am

Some misrepresentations and omissions they left out to get us to pay for this ridiculousness:
-Friends and family can go on vacation, HOWEVER WE HAVE TO BE PRESENT.
-They did not tell us **most locations are booked like a year in advance**. We can not book our vacations like that with our work.
-They left out the Club Dues
-**They left out the maintenance fees**

http://www.timeshareconsumerbureau.com/news/the-wyndham-timeshare-scam
(Last visited Aug. 6, 2019)

20

b.   Wyndham Vacation Resorts / Timeshares / scam promise!
 US Review updated: Jul 10, 2019

I am completely appalled by what I am about to tell you. Purchased a timeshare
from fairfield fairshare plus resorts currently doing business as wyndham vacation
resorts, rci, cendant inc (parent company). Being skeptical about the ease and worry
free vacation promise, they promised big vacation savings, convenience, flexibility,
and great customer service. All false. My main contention for buying this timeshare
was my **inability to use it yearly and lengthy advance reservations. "no
problem, you can bank up to 4 years of unused timeshare**, " they preached.

https://www.complaintsboard.com/complaints/wyndham-vacation-resorts-timesha
res-c59202.html (Last visited Aug. 6, 2019)

c. Tracy Raines Sep 08, 2008

Wow! we bought the discovery vacation you know, just to try it out! We went on
vacation once and that was it. By the time we were ready to use our last 76k points
for a weekend getaway, BAM! Too late, **Don't have anything available and guess
what! You have until February to use your points or they will expire**!
We ar 6mo later still paying on this package that we cannot even use. I wish I knew
how to stop them from drafting anymore of MY money! When I complained to the
person on the phone they put me in touch with another salesman that was willing
to MAKE ME A DEAL!!! Trade up and use our 76K points as payment!!!"

https://www.complaintsboard.com/complaints/wyndham-vacation-resorts-timesha
res-c59202.html (Last visited Aug. 6, 2018)

58.    There has been a tsunami of Class Member complaints about Wyndham.    In the last

three years alone, the Better Business Bureau has received 2,165 complaints about Wyndham.

http://www.timeshareconsumerbureau.com/news/the-wyndham-timeshare-scam has over 1,000

complaints about Wyndham.   Wyndham Owners routinely complain that a requested property is

not available through the Wyndham timeshare program, but can be booked outside the program

through public websites such as trivago.com or booking.com.

59.    Examples of purchaser comments about availability issues follow (with emphasis

supplied throughout and printed versions of the comments attached as **Exhibit J**):

a.  Carrie of Bothell, WA Verified Reviewer

Original review: Aug. 1, 2019
We purchased this timeshare because of the promise of increased ability to vacation with our kids or even get away alone every once now and then. It's been absolutely the opposite. It's impossible to navigate the system, **dates are always blocked out through the owner site but available on public sites**, membership doesn't even cover vacation so you have to upgrade to get any use out of it, and the customer service provided is abysmal. We regret this purchase so much and wish there was a way out of it.

https://www.consumeraffairs.com/travel/wyndham_vacation_resorts.html
(Last visited Aug. 6, 2019)

b.  Butch4/3/2018 04:40:33 pm

**Get this, I just checked on a room at Wyndham Myrtle beach through Trivago for late June, no problem getting one**. Tried to book a room through Wyndham for the same date, **none available**.

http://www.timeshareconsumerbureau.com/news/the-wyndham-timeshare-scam
(Last visited Aug. 6, 2019)

c.  Tamela Gx7/9/2019 12:24:04 pm
**It took us 2 years just to book a vacation** with our ownership. While on vacation when we aired our grievances to Wynhdam, they suggested we upgrade to alleviate our problem and we listened, however, we still could not book. ....
This company should be illegal. $40,000 for 5 nights of vacation.

http://www.timeshareconsumerbureau.com/news/the-wyndham-timeshare-scam
(Last visited Aug. 6, 2019)

## CLASS ACTION ALLEGATIONS

60.  Plaintiff Gebremeskel seeks to represent the following class under F.R. Civ. Pro.

23(b)(3):

All persons who signed Wyndham Security Agreements in Nevada within four years prior to the filing of this suit after attending Wyndham sales presentations

who have unsuccessfully requested cancellation of their contracts.

61.   The Kirchner Plaintiffs seek to represent the following class under F.R. Civ. Pro. 23(b)(3):

> All persons who signed Wyndham Security Agreements in Tennessee within four years prior to the filing of this suit after attending Wyndham sales presentations who have unsuccessfully requested cancellation of their contracts.

62.   Plaintiffs reserve the right to modify the Class definition as they obtain further information through discovery.

63.   Excluded from the Subclass are persons whose contracts were cancelled and persons whose contracts contain class action waiver clauses.  Also excluded from the Class are Defendant and entities in which Defendant has a controlling interest, its agents and employees, the Judge to whom this action is assigned and any member of the Judge's staff or immediate family.

64.   The number of Class Members is believed to be in the thousands, making the class so numerous that individual joinder of all Class Members is impracticable.

65.  Plaintiffs are members of the proposed Class.

66.    There are questions of law and fact common to Plaintiffs and to the proposed Class, including but not limited to the following:

a.   Whether material omissions and misrepresentations were made to Class Members at sales meetings;

b.   Whether Wyndham's actions have damaged Plaintiffs and Class Members;

c.   Whether Plaintiffs and Class Members are entitled to cancel their Agreements; and,

d  Whether Plaintiffs and Class Members are entitled to declaratory, injunctive and

equitable relief to stop further unlawful acts.

67.   Plaintiffs' claims are typical of the claims of Class Members.

68.   Plaintiffs' interests do not conflict with those of Class Members.   They will fairly and adequately protect the interests of Class Members.   They are represented by counsel experienced in class action litigation.

69.   Common questions of law and fact predominate over questions affecting only individual Class Members, and a class action is superior to other methods for the fair and efficient adjudication of this controversy.

70. The interest of Class Members in individually controlling the prosecution of separate claims against Defendant is small due to the time and expense necessary to pursue individual litigation.   Management of these claims in a class action poses no significant impediments.

71.   Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

## COUNT ONE- VIOLATION OF NEVADA DECEPTIVE TRADE PRACTICES ACT

72.   Plaintiffs repeat and reallege paragraphs 1 to 71 above.

73.   This count is brought on behalf of the class who signed contracts in Nevada.

74.   Nevada Revised Statutes Section 598.0915 prohibits deceptive trade practices including making false representations in a transaction.

75.   Nevada Revised Statutes Section 41.600 allows actions to be brought by a person who is a victim of consumer fraud which is defined to include acts prohibited by the Deceptive Trade Practices statute.   Prevailing claimants are allowed to recover damages, equitable relief, costs

and reasonable attorney's fees.

76.   By reason of the conduct alleged above, Wyndham violated the Nevada Deceptive Trade Practices Act.

## COUNT TWO - VIOLATION OF TENNESSE TIMESHARE ACT

77.   Plaintiffs repeat and reallege paragraphs 1 to 71 above.

78.   This count is brought on behalf of the class who signed contracts in Tennessee.

79.   The Tennessee Time Share Act of 1981, Tennessee Code Sections 66-32-101 et seq. prohibits false and misleading statements in the advertising for the offer or sale of time shares including any misleading or deceptive representations with respect to the purchaser's rights, privileges, benefits or obligations under the purchase contract.

80.   Victims of violations have a claim for appropriate relief including punitive damages and attorneys' fees.

81.   By reason of the conduct alleged above, Wyndham violated the Tennessee statute.

82.   Wyndham's conduct was willful, wanton and malicious so as to entitle Plaintiffs to punitive damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief on behalf of themselves and all others similarly situated:

A.   An order certifying the proposed Classes under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Class and Subclass;

B.   For an order that Defendant be permanently enjoined from engaging in the unlawful

activities and practices complained of;

    C.   For cancellation of all Class Member contracts with Wyndham;

    E.   For restitution of all monies paid to Wyndham;

    F.   For compensatory damages;

    G.   For punitive damages;

    H.   For attorneys' fees; and,

    I.   Such further and other relief as the Court deems appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiffs demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: March 27, 2020

                                    Respectfully submitted,

                                    Plaintiffs,

                                    By: */s/ Herbert W. Mondros*

                                    Herbert W. Mondros, Esq. (DE Bar #3308)
                                    Margolis Edelstein
                                    300 Delaware Avenue, Suite 800
                                    Wilmington, DE 19801
                                    Tel. (302) 888-1112
                                    Fax: (302) 888-1119
                                    hmondros@margolisedelstein.com

                                    Howard B. Prossnitz, Esq.
                                    LAW OFFICES OF HOWARD B. PROSSNITZ
                                    1014 Ontario Street
                                    Oak Park, IL 60302
                                    (708) 203-5747
                                    (*Pro hac vice* motion pending)
                                    prossnitzlaw@gmail.com