## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **STEVEN ERIC KIRCHNER,** | ) | |
| **ELIZABETH LEE KIRCHNER,** | ) | |
| **And MARCIA RICHARDS.** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs, individually and on behalf of** | ) | **Civil Action No. 20-436-CFC** |
| **all other persons similarly situated,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **vs.** | ) | |
| | ) | |
| **WYNDHAM VACATION RESORTS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Steven Eric Kirchner, Elizabeth Lee Kirchner (Kirchners), and Marcia Richards (Marcia or Richards), individually and on behalf of all other persons similarly situated, allege as follows for their Complaint against Defendant Wyndham Vacation Resorts, Inc.

## NATURE OF ACTION

1.  This case is about a scheme of common fraudulent omissions by Wyndham whereby Wyndham fails to disclose basic material facts to prospective timeshare Owners which allows it to sell timeshares to persons who would <u>never</u> had bought them had Wyndham disclosed the facts.

2.  Wyndham operates a timeshare ownership program that sells ownership interests in the form of points that are supposed to be used as currency to stay at Club Wyndham resorts, purchase airlines tickets, buy cruises and rent cars.

3.  Wyndham sells timeshare points at an average price of $21,000, which are in fact worth next to nothing.   The day after purchase, these timeshares are essentially worthless.  The situation is analogous to buying a new car for $21,000, driving it off the lot, and having it be worth $1 the

next day.   For example, plaintiff Richards paid $35,900 for 200,000 Wyndham points in connection with her timeshare interest at the Wyndham Grand Desert Resort in Los Vegas, Nevada.   The current bid on ebay.com for 154,000 points at the same location is as follows:

**WYNDHAM GRAND DESERT  - 154,000 POINTS - ANNUAL USAGE!**
*"OWNERSHIP IS FREE AND CLEAR READY TO BE TRANSFERRED!"*

Time left:9d 12h
4/9, 10:00PM

Current bid:
**US $1.00**

4.   Plaintiff Steven Kirchner, a mathematician by education and a Microsoft employee whom works as a contractor at for the U.S. Airforce Central Command facility, has computed that the annual value of his timeshare is less than $200 and that it will soon have negative value.

5.  How is Wyndham able to sell something for $35,900 that is worth $1 on ebay?  It is able to do so by failing disclose material facts to customers.

6.   Plaintiffs do not contend that a Wyndham has a duty to disclose other companies' publicly available pricing or product availability information.   Rather, Plaintiffs allege that as a matter of policy and practice, Wyndham uniformly and standardly fails to disclose basic material facts about its timeshare program.   If any one of these facts, let alone all of them,  had been disclosed to Plaintiffs and Class Members, they would not have purchased Wyndham timeshares. If these material facts had been disclosed to Plaintiffs at the sales presentations, they would have realized that a Wyndham timeshare is a liability not an asset, a liability that requires payments for life.

7.   Wyndham omits to tell customers the following material facts in its sales presentations:

a.  Customers are not told that they will rarely be able to use their timeshares to stay at their desired locations;

b.  Customers are not told that they will need to book up to thirteen months in advance;

c.  Customers are not told that their timeshares will have limited, if any, resale value;

d.  Customers are not told that they will be unable to refinance their timeshare purchases to replace Wyndham's interest rate which can be as high as 15.99%;

e.  Customers are not told that Wyndham will not take their timeshares back unless they first pay off all amounts due to Wyndham;

f. Customers are not told that Wyndham regularly offers better availability to non-Owners on whom it seeks to earn more money by selling them timeshares instead of making space available to existing timeshare Owners;

g.  Customers are not told that if they want to stay at a Wyndham timeshare destination that is not available on the Club Wyndham website, they can go to expedia.com or similar free public website and book the same destination which will be available on the public website and will be available at a  cheaper cost than had they used their Wyndham timeshare points;

h.  Customers are not told that they will not be able to rent out their timeshares to cover their maintenance fees;

i.  Customers are not told that annual maintenance fees will increase significantly;

j.  Customers are not told that using Wyndham points for car rental, airfare, and cruises will be more expensive than paying cash; and,

k.  Customers are not give a sufficient opportunity to read the myriad of documents incorporated by reference into their purchase contracts prior to signing their contracts.

8.  Instead of disclosing these material facts, Wyndham tells customers that they will be making a terrific investment, have great flexibility in travel to go wherever they want, can rent

points to cover their maintenance fees, can have Wyndham take back their timeshares and that they will be saving tens of thousands of dollars on travel.

9. Fraud claims against Wyndham involving these same omissions and representations were pled by plaintiffs in *Buxton v. Wyndham Vacation Resorts, Inc*. ( No. 19-cv-1555-Orl-37DCI), *Campbell v. Wyndham Vacation Resorts, Inc.* (No. 19-cv-01556-Orl-37DCI), *Blessing v. Wyndham Vacation Resorts, Inc.*, (No. 19-cv-1613-Orl-37DCI); *Chandler v. Wyndham Vacation Resorts, Inc.*, (No. 19-cv-1647-Orl-37DCI), and *Mason v. Wyndham Vacation Resorts, Inc.*, (No. 19-cv-1613-Orl-37DCI). On April 22, 2020, Judge Roy B. Dalton, Jr. issued an Order denying Wyndham's motion to dismiss the fraud claims. (**Exhibit A.)**

10. Plaintiffs seek to certify a national class based on fraud claims similar to the national fraud class certified in *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R. D. 125 (S.D.N.Y. 2014). Plaintiffs also seek to certify two subclasses under Nevada and Tennessee consumer protection and timeshare statutes.

## PARTIES

11. The Kirchners are residents of the State of South Carolina. Richards is a resident of the State of Texas.

12. Wyndham is a Delaware corporation.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2). This is a civil action in which the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs. At least one class member is a citizen of a state that is different from the state of citizenship of Defendants.

14.   Venue is appropriate in this District under 28 U.S.C. § 1391 since Wyndham is incorporated in the State of Delaware.

## **FACTUAL ALLEGATIONS**

15.   Wyndham's parent company, Wyndham Destinations Inc. now known as Travel + Leisure Co., trades on the New York Stock Exchange under the ticker name TNL, formerly WYND.  It is the largest timeshare ownership program in the world with 925,000 members and over $5 billion in revenue in 2017.  It develops and operates a portfolio of over 220 resorts throughout the world with 25,000 individual units.

16.   Wyndham markets and sells vacation ownership interests in the form of points, provides consumer financing in connection with the sale of points, provides property management services to the purchasers, and develops and acquires vacation ownership resorts.

17.   In the traditional timeshare business model, a participant purchased a fractional interest in a specific piece of property.   The member would own the right to a specific week of occupancy in a particular unit in a specific identified property.   The participant could then be entitled to trade that week of ownership for a week in another property.   However, if the member did not trade his or her week, he or she was guaranteed the right to stay in the identified week in the identified property.

18.    In the Wyndham model, participants purchase points which are supposed to be currency to stay at any Wyndham or affiliated resort throughout the world.  Fundamental to the Wyndham sales and marketing pitch is that purchasers will have a dizzying array of choices and will be able to stay at their desired property wherever it might be.

19.   Purchasers buy points so they can travel to their desired location whether it is Scotland, Colorado, Hawaii or some other place.  In fact, desired destinations are not available at the desired

time and have to be booked sometimes as much as a year in advance, assuming they are even available. The sales pitch is false and misleading.

20. The business practice of Wyndham is to focus on selling points, rather than managing the destinations and making them available to members. Wyndham makes more money by selling new timeshares than by making accommodations available to existing timeshare Owners. Plaintiffs and Wyndham members find that there is little availability. When they complain, Wyndham's response is that they need to buy more points.

21. Wyndham members are subject to a lifelong frenzied marketing pitch to buy more points and upgrade their membership. When a member arrives for a vacation at a destination, the sales pitch starts before they have even parked their car. A common Wyndham ploy is not to give a parking pass to a member until they agree to attend an "Owner update meeting." The purported Owner update meeting is nothing more than another high-pressure sales presentation to get them to buy more points.

## THE UNIFORM FORMAT OF WYNDHAM'S DECEPTIVE SALES PRESENTATION

22. In order to proceed with a class action, Plaintiffs focus on Wyndham's single, common fraudulent scheme of material omissions – not affirmative misrepresentations. This case is about what Wyndham does not tell customers, rather then what it does tell them. The Rule 9(b) fraud pleading requirements of the who, what, when, where and how for each Class Representative are set forth below. No plaintiff and no Class Member is told of the material omissions pled above.

23. Wyndham begins its fraudulent scheme by luring customers into timeshare sales presentation by offering them "free" prizes, tickets or coupons. It has employees whose sole function is to act as body snatchers, approaching hotel guests, casino visitors, and airport passengers with the promise of a free gift if they attend a Wyndham sales presentation. The fraud

begins at this very moment even before the sales pitch begins.   Customers are not told that meetings will last up to seven hours. Instead, they are promised ninety minute meetings.

24.  The sales presentations follow the same pattern at all Wyndham locations throughout the country.   The structure described below is experienced by all attendees at Wyndham sales presentations which includes the Plaintiffs and the proposed Class Members.

25.  Wyndham's sales presentations follow this uniform pattern:

a.  After being enticed  are enticed to attend the sales meetings by the offer of the  "free" gift, a podium presenter gives a presentation which lasts about half an hour accompanied by a power point and numbers written on a white board;

b.   The podium presenter states that over their lifetimes, customers will save tens of thousands of dollars by buying a Wyndham timeshare, that they will be able to travel around the world, and will be able to stay at luxury resort;

c.  The podium presenter never discloses that the opposite is true;

d.  Customers are given a tour of the Wyndham resort where their sale presentation occurs to show them the type of luxury accommodations where they will supposedly be able to stay;

e.   Customers are not told that these type of luxury accommodations will rarely be available;

f.  Each customer or couple is directed to sit a table a dedicated sales person or persons;

g.  Once at their table, the customers are subjected to multi-hour high pressure sale pitch which leaves out all the material facts;

h.  The compensation of Wyndham sales people is commissioned based;

i.   A tag team approach is used if a customer shows resistance to buying, in which case a sales manager or senior sales person will sit down at the table and make an offer to "discount" Wyndham pricing for that day only;

j.   The atmosphere is similar to a new car dealership where the sales person will often excuse themselves to go talk to a manager in order to supposedly seek a better deal for the customer;

k.   During the multi-hour sales pitch, the sales person will seek to befriend the customer and establish a personal bond;

l.   Customers are not told that a Wyndham will be a never ending lifetime obligation of diminishing value with ever increasing costs financed at a high interest rate;

m.   Customers are given the business card of their sales person with his or her cell phone number on it so they can call their salesperson at any time to get help navigating the Wyndham system, to learn how to use their points, to learn inside tricks on how to manipulate the Wyndham reservation system and how to get availability at the choicest destinations, but they are not told that sales persons routinely stop taking customer calls once the timeshare is purchased;

n.   A false sense of urgency is created with repeated use of phrases such as "one time offer" and "today only" to create the impression that customers will not have the same opportunity again; and,

o.   Nowhere during this process is it disclosed that resorts are systemically unavailable and overbooked.

26.   Judge Dalton's Order in *Buxton*, *supra*, gave an overview of the sales process which is equally applicable here:

Defendants invited the Buxtons, who were vacationing in Orlando, Florida, to a presentation about Defendants' programs that would last no longer than ninety minutes. But the presentation was not as advertised. It lasted multiple hours…

In all the cases, at the presentations, the Sales Agents told Plaintiffs: the deal was good only for day; the Sales Agents would be Plaintiffs' personal representatives, helping them to make the most of their timeshare; the timeshare was a good investment and Plaintiffs could rent out their timeshares to cover all costs.   But these statements weren't true and the Sales Agents knew it.   The Sales Agents also exaggerated the usefulness of points and reservation availability to stay at resorts. Plaintiffs all relied on these statements in purchasing timeshares.
(**Exhibit A** at 5-6.)

27.  Judge Dalton goes on to describe how the contracts are signed:

And when the time came to sign the timeshare contracts, the Sales Agents did not adequately explain Plaintiffs' rescission rights, rushed the closing process, and told Plaintiffs where to sign and initial without explaining what Plaintiffs were signing. *Id*. at 6.

28.  The timeshare documents which each Plaintiff and Class Members signed consist of scores of pages.  Wyndham does not give customers a sufficient opportunity to read the documents. Instead, the sales people flip pages, purport to summarize contract provisions, and point to places for signatures or initials, telling Plaintiffs and Class Members to "sign here" or "initial here".

29.  Plaintiffs' and Class Members' timeshare contracts incorporate by reference other documents including the ClubWyndham Access Vacation Ownership Plan, Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for ClubWyndham Access Vacation Ownership Plan, ClubWyndham Access Public Offering Statement, Articles of Incorporation, By-laws, and Regulations of the Association, Trust Agreements, and Club Property Instruments.

30.  The ClubWyndham Access Vacation Ownership Plan's governing documents includes Declaration of Trust, First Amendment to the Declaration of Trust, Amended and Restated Declaration of Covenants, Conditions and Restrictions and Grant and Reservation of Easements,

PTVO Owners Association, Inc. Articles of Incorporation, PTVO Owners Association, Inc. By-laws, Association Administration and Management Agreement, Rules and Regulations, Property Declaration for ClubWyndham Access Vacation Ownership Plan (Pro-forma Copy), PTVO Owners Association, Inc. Regular Assessment, and PTVO Owners Association, Inc. Audited Financial Statement.

31.  Prior to purchasing their timeshares,  it was physically impossible for Plaintiffs and Class Members read all these documents in the time allocated for signing their contracts.

**The Common Material Omissions  -  Who, What, When, Where and How for Plaintiffs**

32.  In *Buxton*, Judge Dalton wrote,

> There are multiple ways to satisfy Rule9(b) and Plaintiffs' allegations sufficiently put Defendants on notice of the alleged misconduct. (Citation omitted.)  Plaintiffs have alleged *who* is responsible for the misrepresentations: either identifying the Sales Agents by name or specifying the presentation's date, location and resulting transaction contract number.  Plaintiffs also list the specific statements they relied on in buying timeshares. … Plaintiffs' allegations – that they purchased timeshares at specific presentations because of the Sales Agents' specific misstatements – adequately detail how Plaintiffs were misled.
> *Buxton* Order, *supra*, at 9 – 10.

33**.   Plaintiffs Steve and Elizabeth Kirchner -**  The Kirchners attended their sales presentation at the Club Wyndham resort, Margaritaville Island Hotel Pigeon Forge, 131 The Island Drive, Pigeon Forge, Tennessee 37863.   The sales presentation occurred on February 11, 2018 and they signed their contract number 0291-1800654, member number 00203442649 (**Exhibit B** ) on the same day immediately after a multi-hour sales presentation.  Their Wyndham sales people were Dave Monghi, Resort Representative ID 639669, and Ethan Hamby who signed their contract.

34.  On February 11, 2018, Monghi and Hamby failed to disclose to the Kirchners any of material facts set forth in paragraph 7 (a) to (k) above.

35.    Steve Kirchner is 60 years old.  He has a B.A. in mathematics and a Masters in Computer Information Systems.  He is on the payroll of Microsoft Corporation as a Senior Premier Field Engineer for Data and Artificial Intelligence, National Security Group.  He is assigned to work as a contractor at the U.S. Air Force Central Command Facility,  Network Operations Security Center at Shaw Air Force Base in South Carolina.   His wife Elizabeth Kirchner is a homemaker who used to work as a bank teller.   She left her job to be a full time homemaker when her mother had to go into hospice.

36.  The Kirchners were offered a two-day promotional trip by Wyndham to stay in Pigeon Forge, Tennessee.   The offer required that they attend what was billed as one to two-hour sales presentation.   In fact, the presentation took closer to five hours.

37.    The Kirchners were subject to the format of Wyndham high pressure sales presentation pled in paragraph 25 (a) to (o).  They initially declined to purchase Wyndham points, but Wyndham representatives named above told them there was a special deal available for that day only, that they would get extra bonus points if they signed up, and the cost of the contract was lowered by half from its original price.

38.    The Wyndham representatives named above told the Kirchners that they would be saving money on vacations by becoming Wyndham owners and that they would have great flexibility in when and where they could travel to Wyndham resorts.

39.    Nothing was said about public travel websites offering equal availability or better availability at an equal or better price.  Nor was anything said about the value of the Wyndham ownership being de minimis and actually going negative over time.  Nothing was said about the resale value of the timeshare.

40.  The Kirchners purchased 84,000 points for $15,500.

41.    The Kirchners have been unable to book their desired Wyndham destinations at their desired times.  They have requested cancellation of their contract, but Wyndham refuses to cancel it.

42.    Steven Kirchner has used his mathematics education and training to precisely calculate that his Wyndham timeshare ownership is actually going to have negative economic value.  The contractual period for recission in the Wyndham contract is fifteen days.  However, the points the Kirchners purchased were not available for usage until July 1, 2018, more than four months later.  Until the Kirchners had use of the points, they were not able to go on line to the Wyndham booking site and determine the availability of their desired Wyndham resort destinations with their allotted points.   By the time they were able to discover the non-availability of their desired locations, the time for rescission in the contract had long expired.

43.    Steve Kirchner has calculated that the annual dollar value of their 84,000 points is $870 before deducting maintenance  and housekeeping fees.  This calculation is based on how much it would cost them to pay in dollars for the Wyndham rooms they can book with 84,000 points – assuming availability exists allowing them to use the points.  However, their annual maintenance fee is $707 and keeps increasing every year.   Thus, after paying the maintenance fee, the current annual economic benefit of the Wyndham ownership for which they paid $15,500 is about $163 ($870 minus $707).

44.    Thus, when Mr. Kirchner did a cost analysis comparison between Wyndham timeshare resort destinations as promoted on the Club Wyndham website and the same destinations advertised on public websites such as orbitz.com and travelocity.com, he found that the dollar value of his Wyndham timeshare for which he and his wife paid $15,500 is less than $200 per year after accounting for ever increasing maintenance fees and house cleaning fees.   Within four year or less, if maintenance fees continue to increase at 6% to 8%  annually, the value of the Wyndham

timeshare will be a negative number.  Of course, this was never disclosed to the Kirchners in the sales presentation which they attended.  Instead, the Wyndham representatives named above represented the opposite and repeatedly falsely claimed that the timeshare had annual value of $3,000 to $6,000.

45.   At the current rate of maintenance fee increases, maintenance fees will exceed $870 within four years.  In other words, the Kirchners will better off owning no Wyndham timeshare contract than owning one.   It will be cheaper for them to book vacations at Wyndham resorts without ownership than with ownership and this fundamental fact was never disclosed to them. explains why the current bid for 84,000 Wyndham timeshare points is $1 on ebay.  This same type of problem exists for other members of the proposed class.

46.  The Kirchners confirmed that Wyndham destinations are often available to members of the general public, at the same time, they are not available to Wyndham timeshare owners.  For instance, they searched for Wyndham resort destinations in the Orlando area for the week of April 20, 2020.   They found that accommodations were available at the Club Wyndham Orlando International and Club Wyndham Bonnet Creek Resort through the free Wyndham Rewards website, but not available through the Wyndham timeshare Owner site.  It would have been better not to have paid $15,500 for a Wyndham timeshare, and instead simply be a Wyndham Rewards member for free.

47.  **Plaintiff Marcia Richards  -** Marcia works as a Research Administrator at the M D Anderson Cancer Center in Texas.  She has a Masters' Degree in Public Health from Columbia University.  Marcia attended a Wyndham sales presentation at the Club Wyndham Grand Desert, 265 East Harmon Avenue, Las Vegas, Nevada 89169 on May 19, 2016.   She signed contract number 00041-16112013 on the same day immediately after the sales presentation at the same

location. (**Exhibit C**.)    Her Wyndham sales representative was Lovan Crescini Southerland. When Marcia expressed resistance to buying, Lovan Crescini Southerland was joined by Wyndham Sales Representative Patrick Yousef Abinader.    Wyndham sales representative Christina Arnstin (last name spelling based on reading of signature on contract), Sales Agent or Broker License Number 3316 was the Wyndham Quality Assurance Representative who was presented the contract documents and signed them for Wyndham.   Southerland, Abinader and Christina were all present on May 19, 2016 at the Club Wyndham Grand Desert, and they all made the omissions to Marcia pled in paragraph 7 (a) to (k) above.   They failed to disclose the material facts set for paragraph 7 (a) to (k) to Marcia.

48. Marcia had planned her trip to Las Vegas after a family member had just died.   Marcia was dealing with degeneration issues in her spine and was having steroid injections every six weeks under anesthesia.   Her pain during her Las Vegas stay was so bad that she had difficulty walking from the front desk at the Grand Desert to the elevator.

49.   During her stay in Las Vegas, she declined several insistent Wyndham invitations to attend an "Owners Update" meeting which is the euphemism Wyndham gives to its high pressure sales meetings designed to convince Wyndham Owners to spend more money to buy more points. Wyndham Owners who arrive at a resort location are often denied a parking pass for their car until the sign up for an "Owners Update" meeting.

50. On May 19, 2016, which was the last day of her vacation, she was checking out of the hotel and subjected to more pressure to attend the sales meeting even though she only had three hours before having to leave for the airport, return her rental car, and check in.   The Wyndham hotel staff assured her that she had plenty of time to attend the sales meeting which would only last one hour.   She was told that she just needed to watch a short film, discuss her Wyndham

experience with a staff member and she would get a $100 gift.  Of course, these representations about the length of the meeting were false.

51.   Ms. Southerland made the standard false Wyndham sales statement that if Marcia bought timeshare points that Ms. Southerland would be Marcia's personal representative, explain the finer points of the Wyndham system and would have secret tips to share with Marcia.   She did not disclose that she would not be available to Marcia after purchase.

52.   Ms. Southerland continued with the standard false representations that Marcia would save money by using points for travel, car rental, airfare, and cruises and it would be cheaper than booking directly.  She did not disclose that the opposite would occur, i.e. that using points is more expensive not less expensive than paying cash through public travel websites.  Southerland told Marcia that she could refinance her timeshare purchase at a lower interest rate and did not disclose that refinancing was not possible.

53.   Southerland made the routine Wyndham sales misrepresentation that by buying more points that Marcia would overcome the availability problems she had encountered.  She falsely told Marcia that Marcia could rent out points she did not use to cover maintenance fees and costs.

54.   Southerland followed the standard false Wyndham narrative of giving Marcia a business card with her cell phone number and telling Marcia that she would be available anytime to address Marcia's concerns and did not disclose that she would not be available.

55. Mr. Abinader joined the conversation and reinforced false statements such as Marcia being able to use reward points from her Wyndham credit card purchases to cover the cost of maintenance  fees.  He falsely said that Marcia could always sell her points back to Wyndham and did not disclose that she would need to first pay off her balance to Wyndham.

56.   At that point, Christina showed up with the contract documents and rushed Marcia through the signing process knowing that there was no time for Marcia to read the documents since she had to get to the airport.  Christina failed to disclose the statutory rescission period or review Wyndham's public offering statement prior to Marcia signing the contract even such actions are legally required.

57.   After purchase, Marcia discovered that none of what the sales representatives had told her was true and that they had engaged in the omissions pled in paragraph 7 (a) to (k) above. Marcia could not rent her points,  her maintenance fees increased and were not fixed,  and she had to pay off the balance due before she could sell her points back to Wyndham.   She did not have booking priority and greater travel flexibility after buying the points.  She had the same availability and booking problems as before buying the points.

58.   When Marcia complained of the fraud and omissions, she got the standard Wyndham fraudulent response that a huge error had been made to her at the sales presentation in Las Vegas and that the problem was that she needed even more points and a higher tier of ownership.

59.   Marcia has demanded recission and cancellation of her timeshare contract which has been refused by Wyndham.

60.   In short, Marcia experienced the exact same fraud by omission that is pled above and experienced not only by her, but by all proposed Class Members.

**THE OMISSIONS ALLEGED HERE ARE TYPICAL and COMMON FOR THE CLASS**

61.   The omissions made to Plaintiffs concerning availability is typical for  other Class Members.  The same omission is made time and again with uncanny regularity to Class Members. A public records request to the State of Florida, Division of Consumer Services, revealed consumer after consumer complaining of lack of availability of destinations.   Plaintiffs are informed and

believe that a contributing factor to the lack of availability is overselling by Wyndham, ie. that it sells more timeshare points than are possible to use at certain locations.

62.    There has been a tsunami of Class Member complaints about Wyndham and WorldMark.   In the three years alone, the Better Business Bureau has received 2,165 complaints about Wyndham.    The website http://www.timeshareconsumerbureau.com has over 1,000 complaints about Wyndham.   Owners routinely complain that a requested property is not available through the Wyndham timeshare program, but can be booked outside the program through public websites such as trivago.com or booking.com.

63.  Wyndham Owners and putative Class Members have posted repeatedly on consumer complaint boards about the availability omissions and the reality of no availability.  Here are but a few examples:

> a.  Cinthia from Wilder7/9/2019 11:07:24 am
>
> https://www.youtube.com/watch?v=p-wWsEXC9f4&t=16s
>
> Some misrepresentations and omissions they left out to get us to pay for this ridiculousness:
>
> -Friends and family can go on vacation, HOWEVER WE HAVE TO BE PRESENT.
>
> -They did not tell us most locations are booked like a year in advance. We cannot book our vacations like that with our work.
>
> http://www.timeshareconsumerbureau.com/news/the-wyndham-timeshare-scam

> b.  Wyndham Vacation Resorts / Timeshares / scam promise!
>
>  US Review updated: Jul 10, 2019
>
> I am completely appalled by what I am about to tell you. Purchased a timeshare from fairfield fairshare plus resorts currently doing business as wyndham vacation resorts, rci, cendant inc (parent company). Being skeptical about the ease and worry free vacation promise, they promised big vacation savings, convenience, flexibility, and great customer service. All false. My main contention for buying this timeshare was my inability to use it yearly and lengthy advance reservations. "no problem, you can bank up to 4 years of unused timeshare, " they preached.
>
> https://www.complaintsboard.com/complaints/wyndham-vacation-resorts-timeshares-c59202.html

c.  JANHEE3/13/2019 07:38:08 pm

Help! we just signed up for time share with Wyndham Feb 2019 while on vaca in So Carolina. Got home-two days later I went online to see what vaca we will take-so disappointed. Georgia has only one and I need 3 bedroom-**no week open** until dec 2019!! We were told-no problem booking EVER..except around holidays--then you should book a few months. Tried to cancel-but we were TWO days out of the 5 day contract period. Now they say..too bad--you pay us the $30,000 and monthly maintenance. This is wrong-they are not giving what they promised to us. Help! How can I get out of contract? any advice? thanks

http://www.timeshareconsumerbureau.com/news/the-wyndham-timeshare-scam

d.  Carrie of Bothell, WA Verified Reviewer

Original review: Aug. 1, 2019

We purchased this timeshare because of the promise of increased ability to vacation with our kids or even get away alone every once now and then. It's been absolutely the opposite. It's impossible to navigate the system, **dates are always blocked out through the owner site but available on public sites**, membership doesn't even cover vacation so you have to upgrade to get any use out of it, and the customer service provided is abysmal. We regret this purchase so much and wish there was a way out of it.

https://www.consumeraffairs.com/travel/wyndham_vacation_resorts.html

e.  Butch4/3/2018 04:40:33 pm

Get this, I just checked on a room at Wyndham Myrtle beach through Trivago for late June, no problem getting one. Tried to book a room through Wyndham for the same date, **none available**.

http://www.timeshareconsumerbureau.com/news/the-wyndham-timeshare-scam

f.  Tamela Gx7/9/2019 12:24:04 pm

**It took us 2 years just to book a vacation** with our ownership. While on vacation when we aired our grievances to Wynhdam, they suggested we upgrade to alleviate our problem and we listened, however, we still could not book. ....
This company should be illegal. $40,000 for 5 nights of vacation.
http://www.timeshareconsumerbureau.com/news/the-wyndham-timeshare-scam

64.  Since the filing of the original case in the Northern District of Illinois, *Deneen et al. v.*

*Wyndham Vacation Resorts, Inc.* (No. 19-cv-5499) in August 2019,  Plaintiffs' counsel has been

contacted by about 200 Wyndham timeshare Owners complaining that the same thing alleged in

the complaint happened to them.  They want to join the class action.  As recently, as March 26,

2021, a Wyndham Owner, Sally Potts, a 76 year old retiree, wrote a unsolicited handwritten letter

to this Court asking for "protection from a scam involving Wyndham Club Resorts".  (**Exhibit**

**D.)**     She states that Wyndham wants to charge her $200 if she refuses to attend a timeshare sales

presentation.

<u>**CLASS ACTION ALLEGATIONS**</u>

65.  Plaintiffs seeks to represent the following class under F.R. Civ. Pro. 23(b)(3):

All persons who signed Wyndham timeshare agreements within four years prior to
the filing of this suit without arbitration clauses in their contracts after attending
Wyndham sales presentations who have unsuccessfully requested cancellation of
their contracts.

66.   The Kirchner Plaintiffs seek to represent the following subclass:

All persons who signed Wyndham timeshare agreements in Tennessee within four
years prior to the filing of this suit after attending Wyndham sales presentations
who have unsuccessfully requested cancellation of their contracts.

67.  Plaintiff Richards seeks to represent the following subclass:

All persons who signed Wyndham timeshare agreements in Nevada within four
years prior to the filing of this suit after attending Wyndham sales presentations
who have unsuccessfully requested cancellation of their contracts.

68.   Plaintiffs reserve the right to modify the Class definition as they obtain further

information through discovery.

69.  Excluded from the Class is Defendant Wyndham and entities in which Defendant has

a controlling interest, its agents and employees, the Judge to whom this action is assigned and any

member of the Judge's staff or immediate family.

70.   The number of Class Members is believed to be in the hundreds or more, making the class so numerous that individual joinder of all Class Members is impracticable.

71.   Plaintiffs are members of the proposed Class and Subclasses.

72.   There are questions of law and fact common to Plaintiffs and to the proposed Class and Subclasses, including but not limited to the following:

a.  Whether material omissions were made to Class Members at sales meetings;

b.  Whether Wyndham damaged Plaintiffs and Class Members;

c.  Whether Plaintiffs and Class Members are entitled to cancel their Agreements; and,

d.   Whether Plaintiffs and Class Members are entitled to declaratory, injunctive and equitable relief to stop further unlawful acts.

73.   Plaintiffs' claims are typical of the claims of Class Members.

74.   Plaintiffs' interests do not conflict with those of Class Members.   They will fairly and adequately protect the interests of Class Members.

75.   Plaintiffs are represented by counsel experienced in class action litigation.   The case is an outgrowth of the *Deneen v. Wyndham Vacation Resorts, Inc.* (No. 19-cv-5499) filed in the Northern District of Illinois in August, 2019.   The *Deneen* Court dismissed without prejudice for lack of personal jurisdiction.   Class discovery was well underway in *Deneen*.   Wyndham was ordered to produce tens of thousands of documents, including customer files, after Plaintiffs had to file a motion to compel discovery. [1]

---

1 The instant case is for Owners <u>without</u> arbitration clauses.  Plaintiffs' counsel also filed a class action for Wyndham Owners with arbitration clauses, *Bedgood et al. v. Wyndham Vacation Resorts, Inc. et al*., (M.D. Fla. No. 21-cv-00418) because Wyndham is not honoring the arbitration clauses.   The arbitration clauses require that Owners file consumer arbitrations with the American Arbitration Association (AAA) under its consumer arbitration rules.   Wyndham owes the AAA unpaid arbitration fees and it refuses to comply with the AAA directive to remove a forum selection clause limiting arbitrations to Orange County Florida.   The  AAA is refusing to hear Wyndham

76.     Common questions of law and fact predominate over questions affecting only individual Class Members, and a class action is superior to other methods for the fair and efficient adjudication of this controversy.

77.     The interest of Class Members in individually controlling the prosecution of separate claims against Defendant is small due to the time and expense necessary to pursue individual litigation.

78.     Management of these claims in a class action poses no significant impediments.

79.     Defendant Wyndham has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

## Punitive Damages Should Be Assessed

80.     For nearly twenty years, Wyndham has been sanctioned for its deceptive practices through state government penalties, orders requiring rescission of purchase contracts and a $20 million verdict in a whistle blower case.  Instead of reforming its practices, it has doubled down on its deceptions. The only way that Wyndham will bring honesty to its sales practices is if punitive damages are assessed.  Since Plaintiffs' contracts are voidable and rescindable, the clause limiting punitive damages does not apply.

81.     Since 2003, there has been a steady drum beat of adverse awards against Wyndham as well as settlements forcing it to pay damages, penalties and grant rescission.

---

cases.  When customers then try to file suits in court, Wyndham moves to compel arbitration.   It has been losing those motions to compel.  In *Heisman v. Wyndham Vacation Resorts, Inc.*, 2021 WL 1138125, 2021 U.S. Dist. LEXIS 55369 at *8 (D. N.J. Mar. 22, 2021), the Court wrote that Wyndham was giving "Plaintiffs a runaround" and analogized Wyndham's conduct to a "shell game".

82.    In October 2003, the California Attorney General and the District Attorney for the County of San Mateo sued Trendwest Resorts, the predecessor of Wyndham, for its unlawful sales practices and material misrepresentations.   The case was settled with Trendwest agreeing to an injunction barring it from further violations and requiring it to offer rescission to customers. It also had to pay $795,000 in civil penalties.   The estimated total value of the settlement was $ 4.3 million.   The California Attorney General issued a Press Release about the settlement saying Trendwest [predecessor to Wyndham] misled consumers through deceptive sales practices and non-disclosure, and illegally denied consumers the ability to cancel their contracts. Trendwest Will Pay Restitution to Consumers and $795,000 in Civil Penalties, October 29, 2003, https://oag.ca.gov/news/press-releases/attorney-general-lockyer-settles-lawsuit-against-one-worlds-largest-timeshare. (Last visited August 10, 2019.)

83.    In 2007, California customers sued Wyndham in a class action.   The case settled on a class basis.  *(Wixon et. al. v. Wyndham Resort Development Corp.*, N. D. Cal.  Case No. C 07-02361.)   The settlement class consisted of California residents and persons who entered into transactions in California, who bought Worldmark timeshare interests from Wyndham.   The settlement was for persons who purchased timeshares before November 5, 2006.   Wyndham agreed to cancel 22 million vacation credits; it made changes to its timeshare program; and it agreed to pay class counsel up to $5 million in legal fees.

84.    In 2015, the State of Wisconsin sued Wyndham for rescission of timeshare purchase contracts with 29 owners.  As part of a settlement, Wyndham agreed to pay $665,000 in restitution, a $99,520 civil fine, $62,702.20 in fees and costs, and to rescind the contracts.   (Sauk County Wisconsin Case No. 2015CX000005).   The Wisconsin Department of Agriculture, Trade and Consumer Protection alleged that Wyndham sales personnel had made misrepresentations

inconsistent with purchase contracts, telling customers gift incentives were available for one day only, and not disclosing on first contact with prospects that a timeshare sale was being offered. The restitution and debt relief was $84,698 for one Madison, Wisconsin couple.   After the settlement, Wyndham issued a press release promising to meet the highest standards of fairness and transparency to consumers.

https://www.wiscnews.com/news/local/crime_and_courts/wyndham-settles-consumer-complaints-for/article_c041b926-efda-53da-8d61-5560c7fc3718.html (Last visited August 13, 2019.)

85.   In 2016, a Wyndham whistle blower employee was awarded $20 million *(Williams v. Wyndham Vacation, Ownership, Inc.*,  San Francisco Superior Court,  Case No. CGC- 12-526187) after being wrongfully terminated.  The whistle blower exposed that Wyndham defrauded elderly customers, opened and maxed out credit cards without their knowledge, and lied about fees.   In its rulings on post-trial motions, the court found that Wyndham's San Francisco site was defrauding many customers, mainly the elderly.

86.   What does not fully come through in legal pleadings such as this is that real people, often senior citizens, have suffered real damage due to Defendants' fraud.  What follows is a snippet about real people who have posted their narratives of Wyndham fraud on youtube.com, including their statements that destinations are never available.  These narratives are referenced here to show that Wyndham acted willfully, wantonly and maliciously towards the Class.   Further, the narratives establish the typicality of Plaintiffs' claims.  The narrative of Margaret Chandler cited  below parallels the key allegations of this Complaint.

87.  WTVF, Channel 5, Nashville, Tennessee has run at least two investigative reports on Wyndham's deceptive practices.  The video referenced below was published on youtube.com  on May 3, 2018 and has received over 42,000 views.  Doyle and Mindy Campbell attended a

Wyndham timeshare presentation at a Wyndham location in Nashville depicted below.   They were offered a prize to attend a "ninety-minute" timeshare presentation.   The presentation actually took several hours.   They also allege that Wyndham opened  a $15,000 line of credit without their knowledge.



Couple Goes To Wyndham Timeshare Meeting, Unknowingly Gets $15K Line Of Credit

https://www.youtube.com/watch?v=zmRdKFWV30Q&t=12s



Couple Goes To Wyndham Timeshare Meeting, Unknowingly Gets $15K Line Of Credit

42,707 views • May 3, 2018

88.   Another investigative news report by Nashville Channel 5 referenced below includes an interview of 76 year-old widow Mildred Folds who went $175,000 into debt after buying Wyndham timeshare points.   Houston and Brenda Garvin are also interviewed. They lost over $600,000.  These Owners sued Wyndham for theft by conversion and other fraud related claims. They complained of lengthy high pressure sales meetings that included being told to "sign here" and "sign there" when it came time to review their contracts.



Elderly Claim Timeshare Company Scammed Them
https://www.youtube.com/watch?v=SVh3dgi_-Ec

89. The next video depicted below was posted on March 26, 2018 by Margaret Chandler. She is a retired school teacher. Her husband Ed is a retired carpenter and a Vietnam veteran. They were 71 years old at the time of the video. She states that Wyndham took money from them dishonestly. A Wyndham representative in Las Vegas offered them free tickets to a show for attending a short timeshare presentation. It was promised to last no more than sixty minutes. It actually went on for hours. Their salesperson Aretha befriended them and started calling Margaret, "Mom". What Margaret recounts is exactly what happened to the Class Representatives in this case. "They [Wyndham sales people] told us we could book anywhere at any time". (3:19 in

video.)  "Nothing is ever available".   (7:47 in video.) "We had been lied to." (7:58 in video.)

"Nothing you are told is true." (8:40 in video). "Wyndham does not care.  They just move on to

the next victim."   (9:05 in video). See https://www.youtube.com/watch?v=WwnQ_2RCwF0.



90.  On February 19, 2019, senior citizen and disabled military veteran Master Sergeant

Jim Sherwood posted the following video about his Wyndham experience.

https://www.youtube.com/watch?v=YEHBhtGlbQI&t=10s.  He ended up in a five- hour

Wyndham sales presentation.  He felt defrauded by Wyndham who would not acknowledge his

disability when he tried to cancel his contract.  His credit report was affected.  "These actions [of

Wyndham] in my opinion are fraud".  (4:17 in video).



91.   Numerous other Wyndham Owners have recorded and posted their experiences of Wyndham's fraudulent sales practices.

**<u>COUNT ONE -  FRAUDULENT INDUCEMENT BY OMISSION</u>**

92.   Plaintiffs repeat and realleged paragraphs 1 to 91.

93.   The omissions and non-disclosure by Defendant pled in paragraph 7 (a) to (k) above were materially false.   The identical material omissions for all Plaintiffs and Class Members establishes the existence of a single common fraudulent scheme.   Courts have certified national class actions which involve a single common scheme and plead common law fraud.

94.   Defendant knew of the falsity of the omission or were recklessly indifferent to its falsity.

95.  Defendant intended that Plaintiffs and Class Members rely on the omission.

96.  Plaintiffs actually and justifiably relied on the misrepresentations and omissions and thereby sustained injury.

97.  By reason of the omission, Plaintiffs and Class Members were fraudulently induced to enter into contracts with Defendants.

98.  Defendants' actions were willful, wanton and malicious so as to allow the recovery of punitive damages.  The contract's punitive damages exclusion fails since the contract is voidable.

## COUNT TWO - VIOLATION OF NEVADA DECEPTIVE TRADE PRACTICES ACT

99.  Plaintiffs repeat and reallege paragraphs 1 to 91 above.

100.  This count is brought on behalf of the class who signed contracts in Nevada. Nevada Revised Statutes Section 598.0915 prohibits deceptive trade practices including making false representations in a transaction.

101.  Nevada Revised Statutes Section 41.600 allows actions to be brought by a person who is a victim of consumer fraud which is defined to include acts prohibited by the Deceptive Trade Practices statute.   Prevailing claimants are allowed to recover damages, equitable relief, costs and reasonable attorney's fees.

102.  By reason of the conduct alleged above, Wyndham violated the Nevada Deceptive Trade Practices Act.

## COUNT THREE - VIOLATION OF TENNESSE TIMESHARE ACT

103.  Plaintiffs repeat and reallege paragraphs 1 to 91 above.

104.  This count is brought on behalf of the class who signed contracts in Tennessee.

105.  The Tennessee Time Share Act of 1981, Tennessee Code Sections 66-32-101 et seq.

prohibits false and misleading statements in the advertising for the offer or sale of time shares including any misleading or deceptive representations with respect to the purchaser's rights, privileges, benefits or obligations under the purchase contract.

106.  Victims of violations have a claim for appropriate relief including punitive damages and attorneys' fees.

107.  By reason of the conduct alleged above, Wyndham violated the Tennessee statute.

108.  Wyndham's conduct was willful, wanton and malicious so as to entitle Plaintiffs to punitive damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief on behalf of themselves and all others similarly situated:

A.  An order certifying the proposed Classes under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Classes;

B.  For an order that Defendants be permanently enjoined from engaging in the unlawful activities and practices complained of;

C.  For a declaration that the arbitration, class action waiver and jury trial waiver clauses in Plaintiffs and Class Member contracts are null and void;

D.  For an injunction against Defendants entering into new contracts which have AAA consumer arbitration clauses;

E.  For cancellation of all Class Member contracts with Defendants;

F.  For restitution of all monies paid to Defendants;

G.  For compensatory damages; and,

H.  For punitive damages.

## DEMAND FOR A JURY TRIAL

Plaintiffs demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Plaintiffs,

RIGROSKY LAW, P.A.

By: */s/ Herbert W. Mondros*
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Email: sdr@rl-legal.com
Email: gms@re-legal.com
Email: hwm@rl-legal.com

LAW OFFICES OF HOWARD B. PROSSNITZ
1014 Ontario Street
Oak Park, IL 60302
(708) 203-5747
(*Pro hac vice*)
prossnitzlaw@gmail.com

Adam Szulczewski, Esq.
1421 West Fletcher Street, 1 F
Chicago, IL 60657
(248) 930-6001
(*Pro hac vice*)
szulcze@outlook.com

Dated:  April 26, 2021

### Certificate of Service

Herbert Mondros, an attorney, certifies that he served a copy of the foregoing Amended

Complaint through the Court's CM/ECF electronic filing system on all counsel of record on this

26th day of April, 2021.

*/s/ Herbert W. Mondros*